UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Application of JSC BTA BANK

For an Order to Conduct Discovery for Use in Foreign Proceedings

Case No. _____

## DECLARATION OF JASON KISLIN IN SUPPORT OF APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, the undersigned, Jason Kislin, under oath and penalty of perjury, pursuant to 28 U.S.C. § 1746, and duly authorized, declare the following:

1.  I am a shareholder with Greenberg Traurig, LLP ("GT"), counsel for the Applicant, JSC BTA Bank ("Applicant", "BTA", or "BTA Bank").

2.  I submit this Declaration, based on my own personal knowledge or review of the relevant documents, in support of Applicant's application for an Order, pursuant to 28 U.S.C. § 1782, for leave to serve The Clearing House Payments Company L.L.C. (the "Clearing House") and thirteen intermediary banks[1] (the "Intermediary Banks") (collectively, the "Discovery Targets") with discovery subpoenas in connection with: (i) judgments obtained against Mukhtar Ablyazov ("Ablyazov") and six alleged associates, pursuant to thirteen sets of proceedings that were commenced by the Applicant in August 2009 in England and Wales in respect of which judgments in excess of $4.6 billion were obtained (the "English Proceedings"); (ii) an ongoing civil proceeding pending in England and Wales against Ilyas Khrapunov ("Khrapunov") and his co-defendants entitled *JSC BTA Bank [versus] Mukhtar Ablyazov, et al.,* Claim No. CL-2015-000549, in the High Court of Justice, Business and Property Courts of

---

[1] Specifically: (1) Bank of America, N.A.; (2) Bank of China; (3) The Bank of New York Mellon; (4) BNP Paribas USA; (5) Citibank, N.A.; (6) Commerzbank AG; (7) Deutsche Bank Trust Company Americas; (8) HSBC Bank USA, N.A.; (9) JPMorgan Chase Bank, N.A.; (10) Societe Generale; (11) Standard Chartered Bank; (12) UBS AG; and (13) Wells Fargo Bank, N.A.

England and Wales, Commercial Court of London, England (the "Khrapunov Proceedings") [Exhibit 1 & 2]; and (iii) other contemplated proceedings to be filed by the Applicant before the English Courts and elsewhere, as described below.

**Factual Background**

3. BTA is a bank based in the city of Almaty in the Republic of Kazakhstan.

4. Between May 2005 and February 2009, BTA was controlled by Ablyazov, its Chairman and primary shareholder.

5. In 2008, during the global credit crunch, the Kazakh financial regulator (the "AFN") began investigating BTA's loan portfolio. During its investigation, the AFN identified a number of issues particularly in relation to BTA's risk management practices and required BTA to make an additional provision of $3.58 billion in order to cover its potential exposure.

6. On 30 January 2009, BTA informed the AFN that it could not meet its liabilities.

7. In February 2009, BTA was effectively nationalized, via the Kazakh sovereign wealth fund (Samruk-Kazyna).

8. Thereafter, Ablyazov was dismissed as Chairman of BTA and subsequently fled to London, England.

9. Subsequent internal investigations by BTA revealed an enormous hole in its balance sheet.

10. KPMG was engaged by BTA's new management and advised that BTA should provision for $16.5 billion as a result.

11. BTA also found evidence leading it to believe that its former management, in particular Ablyazov, had embezzled vast amounts of its funds including by directing and authorizing unsecured loans from BTA to companies that Ablyazov controlled and which had no assets.

12. Ablyazov effectively used BTA as his own personal piggy bank, illegally syphoning off between approximately $6 billion and $7.5 billion of BTA's assets through a combination of withdrawals, phony loans and other mechanisms.

13. Thereafter, and as described further below, Ablyazov attempted to conceal the fruits of his crimes by engaging in acts with co-conspirators to conceal the location and to launder the proceeds of his crime.

14. Based in part on information provided by BTA, law enforcement authorities in France, Kazakhstan and Switzerland have active investigations into Ablyazov's crimes against the Applicant. There are also other open criminal investigations in several jurisdictions concerning related crimes by the same individuals.

15. BTA is also the complaining victim in a Kazakhstan investigation into the BTA Bank theft and continues to cooperate with Kazakh law enforcement authorities.

16. Most recently, prosecutors in France have, following a complaint filed with the French authorities by the Kazakh authorities in 2017, arrested Ablyazov in October 2020 and charged him with aggravated abuse of trust and money laundering [Exhibit 3]. Moreover, on 29 December 2020, the Moscow Tagansky District Court handed down a 15-year prison sentence in absentia against Ablyazov for embezzlement related charges [Exhibit 4].

**THE ENGLISH PROCEEDINGS**

17. In August 2009, BTA Bank commenced proceedings in England and Wales against Ablyazov pursuant to which a worldwide freezing order was granted against Ablyazov and six alleged associates.

18. In total BTA brought thirteen sets of proceedings in the High Court of England and Wales (the "English High Court") between 2009 and 2010 against Ablyazov and various other associates and related parties alleging fraud and embezzlement on an unprecedented scale.

19. Essentially, BTA alleged that Ablyazov had helped himself to huge amounts of BTA's cash reserves by causing BTA to make substantial transfers, including dollar denominated transfers, to (or for the benefit of) a considerable number of overseas companies that Ablyazov secretly owned and/or controlled.

20. In the course of those claims Ablyazov failed to provide full disclosure of his assets and answer certain other queries as he was required to do in those proceedings. The English High Court found that Ablyazov knowingly gave false evidence during the course of his cross-examinations in October and November 2009, with the intention of interfering with the administration of justice.

21. In August 2010, BTA successfully applied to the English High Court for receivers to be appointed over Ablyazov's assets in light of Ablyazov's persistent non-disclosure and breaches of Court orders (the "Receivership Order"). The Receivership Order has been varied from time to time to cover over 1000 companies and other assets believed to be owned or beneficially owned by Ablyazov.

22. In February 2012, following a committal hearing, Ablyazov was found to have lied in his asset disclosure and cross-examinations, and to have dealt with certain assets in breach of the worldwide freezing order issued by the English High Court, as well as to have relied on backdated and fabricated documentation and suborned the giving of evidence.

23. Ablyazov subsequently fled to France before judgment could be handed down. In his absence, Ablyazov was found to be in contempt of Court and was sentenced by the English High Court to three concurrent 22-month terms of imprisonment.

24. It was subsequently ordered that Ablyazov's defenses to the civil proceedings against him in the English High Court be struck out.

25. Three of BTA's claims against Ablyazov and his associates were then selected to proceed to trial. In each of the subsequent proceedings, judgment was entered in favor of

4

BTA and against Ablyazov and his associates in excess of $4.6 billion. After judgment was obtained, the freezing order against Ablyazov was made unlimited in amount on 23 November 2012 [Exhibit 5].

26. No part of these judgments has been voluntarily paid by Ablyazov and the Applicant has recovered, through means of enforcement, only a relatively small amount of the monies stolen from it, including against some properties located in the UK belonging to Ablyazov, totaling approximately $45 million arising from the various English proceedings.

27. The Applicant has also taken control over other assets (mainly located in the CIS), resulting in total recoveries of less than 20% of the amounts owed pursuant to the judgments.

28. Since obtaining judgments in respect of the English Proceedings, BTA has moved aggressively in multiple jurisdictions (mainly consisting of judgment recognition proceedings) including in Switzerland, Lichtenstein, Luxembourg and the USA to locate, and to freeze, Ablyazov's assets in order to (eventually) recover the proceeds of Ablyazov's crimes against the Applicant.

29. BTA's extensive asset recovery and enforcement efforts have been frustrated by Ablyazov and his co-conspirators' use of a web of companies, many offshore and held via straw man or nominee owners, to conceal their assets and as such, the proceeds of their crimes. Through the myriad of shell companies, Ablyazov and his co-conspirators have managed to effect hundreds of financial transactions and transfers between countries and institutions in order to put their assets beyond BTA's reach.

**THE KHRAPUNOV PROCEEDINGS**

30. During the course of its investigation, BTA discovered that one of Ablyazov's key co-conspirators was Ilyas Khrapunov, his son-in-law and "right hand man".

31. In July 2015, BTA issued the Khrapunov Proceedings in the English High Court against Khrapunov and Ablyazov.

32. BTA alleged in the Khrapunov Proceedings that Khrapunov had been, since December 2009 at the latest, involved in the conspiracy with Ablyazov that involved concealing, dealing with, disposing of, and/or diminishing the value of the money stolen by Ablyazov from BTA (hereinafter, the "**Ablyazov-Khrapunov Scheme**").

33. The facts uncovered by BTA and the other victims of the Ablyazov-Khrapunov Scheme and the crimes concerned reads like an international thriller. *See e.g.* Stephen M. Bland, *The Case of the Khrapunovs*, THE DIPLOMAT, (Jul. 18, 2018), http://www.thediplomat.com/2018/07/the-case-of-the-khrapunovs, attached hereto as [Exhibit 6].

34. In June 2018, BTA eventually obtained a partial judgment of $500 million against Khrapunov in respect of the Khrapunov Proceedings in the English High Court (following his breach of Court orders relating to the disclosure of his and Mr Ablyazov's assets) [Exhibit 7].

35. In September 2018, the English High Court stayed the Khrapunov Proceedings and the stay currently remains in place. With the information that BTA anticipates obtaining through this application, BTA intends to seek the UK Court's permission to lift the stay in order to add additional defendants to the Khrapunov Proceedings and amend the relevant freezing orders to ensure that assets, once located, do not disappear before judgment is rendered.

**OTHER JUDGMENTS OBTAINED BY BTA**

36. In addition to locating assets, BTA Bank has attempted to identify and gather evidence against Ablyazov's co-conspirators and the entities which were involved in the original crimes against BTA and in laundering the proceeds of those crimes.

37. In addition to judgments obtained pursuant to the English Proceedings and the Khrapunov Proceedings, BTA has also obtained judgments in other jurisdictions against certain entities established by both Ablyazov and Khrapunov for the purposes of laundering money and assets stolen by Ablyazov from BTA Bank.

38. The English Courts have also granted freezing orders against Ablyazov and Khrapunov, with such orders covering any entities that are owned and/or controlled by Khrapunov and Ablyazov worldwide. As stated above, Ablyazov and Khrapunov have a history of using nominees and a complex network of offshore companies to conceal their ownership of assets. At least in part, this was done with the assistance of Mr Eesh Aggarwal, a British accountant based in Dubai, UAE, who assisted with creating an elaborate structure of companies on behalf of Ablyazov and Khrapunov and their other co-conspirators.

**BACKGROUND TO PANOLOS AND ITS INVOLVEMENT IN THE ABLYAZOV-KHRAPUNOV MONEY LAUNDERING SCHEME**

39. BTA believes that the evidence outlined below indicates that one entity, that is not yet subject to an English Court judgment, Panolos Limited ("Panolos") appears to have been used in the Ablyazov-Khrapunov Money Laundering Scheme and other illicit activities.

40. BTA's case against Panolos in the UK is currently in the pre-trial discovery stage, and BTA is continuing to amass evidence in respect of Panolos', as well as other entities and individuals', involvement in the Ablyazov-Khrapunov Money Laundering Scheme in an attempt to locate its assets as well as those assets of Ablyazov, Khrapunov and their other co-conspirators, and to apply for worldwide freezing orders to ensure that such assets, once located, do not disappear before any future judgment is rendered. The Applicant may also seek ancillary actions before such courts of competent jurisdiction against the transferees or recipients of assets or money transfers, including individuals and entities that are identified as being connected with the Ablyazov-Khrapunov Money Laundering Scheme during BTA's pre-

7

trial discovery stage, in order to trace and collect such proceeds (collectively, the "Contemplated Proceedings").

41. According to filings in the corporate records, Panolos was registered as a corporation in St. Vincent and the Grenadines on 20 July 2011, but the registration documents do not identify any shareholders, directors or beneficial owners. Attached hereto as [Exhibit 8].

42. BTA has, however, uncovered other public records and information that have led it to conclude that Panolos is owned and controlled by Khrapunov and has been used in the Ablyazov-Khrapunov Money Laundering Scheme.

43. According to French corporate records and property registers, on 19 May 2011, an entity called SCI Anidam ("Anidam") was incorporated in France with Khrapunov listed as Anidam's sole director and 0.02% shareholder. Madel BV ("Madel"), a Netherlands entity, was listed as the only other shareholder in Anidam, holding the remaining 99.98% of the interest [Exhibit 9].

44. Madel is an entity that is ultimately owned by Khrapunov [Exhibit 10,11 & 12]. To that end, Madel is owned by Bishort Ventures, Ltd, a Cypriot entity, which in turn is owned by Vilder SA ("Vilder")[Exhibit 13], a Panamanian entity, which is directly owned and controlled by Khrapunov, as disclosed pursuant to an order for full disclosure as to how Khrapunov was funding his legal expenses during the Khrapunov Proceedings in which it was recorded that Khrapunov "*identifies his sole personal assets as his interest in the Vilder Foundation*" (the owner of Vilder), and that Vilder is in fact "*an asset belonging to Khrapunov*" [Exhibit 14].

45. Significantly, Vilder was the recipient of funds (at least $69 million directly from Northern Seas Waterage Inc. ("Northern Seas Waterage"), a Seychelles entity (which Mr Aggarwal disclosed, pursuant to an affidavit that he provided following BTA's order for third

8

party disclosure against him, had transferred funds between December 2011 and October 2021 in the amount of $439.49 million on the instructions of Khrapunov Northern Seas Waterage and Vilder have been determined to be a key component of the Ablyazov-Khrapunov Money Laundering Scheme [Exhibit 1, 14 & 15].

46. BTA believes that, using money flowing from Northern Seas Waterage, through to Vilder, and onto Madel and subsequently Anidam, Khrapunov, as ultimate beneficial owner of Anidam, purchased certain real property in Courchevel France in 2011 (the "Courchevel Property") in the name of Anidam [Exhibit 10].

47. That Khrapunov is the ultimate beneficial owner of the Courchevel Property is further confirmed by certain French corporate records, which also identify Khrapunov as a shareholder in and sole-director of Anidam. These records also indicate that the price paid for the Courchevel Property in 2011 was €950,000 [Exhibit 10].

48. In or about November 2014, Khrapunov transferred Madel's interest in and ownership of Anidam to Panolos, pursuant to which Panolos became the 99.98% owner of Anidam, which, at that point, had purchased and continued to hold the Courchevel Property [Exhibit 10]. The purported price for the transfer of Madel's interest in Anidam to Panolos was an offset of a €2 million debt allegedly owed by Madel to Panolos. Thus, Madel transferred the Courchevel Property, valued three years earlier at €950,000, to extinguish a €2,000,000 debt. This type of transfer and cancellation of debt is consistent with other transactions in the Ablyazov-Khrapunov Money Laundering Scheme.

49. As of July 2019, Anidam was struck off from the French Corporate Register and by July 2020 Anidam had ceased all activity and had been dissolved. It is unclear what has subsequently happened to the Courchevel Property, and whether or not it has been sold by Anidam, pursuant to which Panolos would have received the proceeds of said sale.

50. Given the propensity for individuals and entities involved in the Ablyazov-Khrapunov Money Laundering Scheme to effect US dollar denominated transactions, it is inferred that the proceeds of sale of the Courchevel Property could have been transferred from or passed through correspondent banks to the banks with which Panolos kept bank accounts. Moreover, given Panolos involvement in the Ablyazov-Khrapunov Money Laundering Scheme, information relating to US dollar denominated transactions from bank accounts owned by Panolos, or their correspondent banks, is likely to reveal information relevant to tracing the proceeds of the fraud against BTA, and may also identify additional potential defendants to BTA's equitable proprietary tracing claims before the English Courts.

51. Lastly the evidence sought, is likely to reveal further details in respect of the Ablyazov-Khrapunov Money Laundering Scheme, perpetrated by Ablyazov, Khrapunov and their associates and individuals and entities controlled by them, which the Applicant can rely on as evidence to prove the elements of fraud in the English Proceedings, Khrapunov Proceedings and the Contemplated Proceedings.

**APPLICANT SATISFIES THE STATUTORY REQUIREMENTS UNDER 28 U.S.C § 1782**

52. The Applicant seeks assistance from the United States District Court for the Southern District of New York to obtain relevant and probative documentary evidence from the Discovery Targets for use in the English Proceedings, the Khrapunov Proceedings and the Contemplated Proceedings.

53. The Clearing House regularly transacts business in this District and operates the Clearing House Interbank Payment System ("CHIPS"), which is a funds-transfer system that processes and maintains records of payment messages between banks. Similarly, the Intermediary Banks are banks that transact business in this District, including as correspondent banks, clearing international U.S. Dollar denominated wire transfers between banks.

54. The Applicant seeks CHIPS and each of the Intermediary Bank's payment messages naming or referencing: (i) "Panolos" which as set out above is suspected to have benefited from the proceeds of the Ablyazov-Khrapunov Money Laundering Scheme, *amounting to billions of dollars, (ii) "Ablyazov" and (iii) "Khrapunov"*. Such evidence is extremely important to reveal the details of the Ablyazov-Khrapunov Money Laundering Scheme which will be grounds for the reliefs sought in the English Proceedings, the Khrapunov Proceedings and the Contemplated Proceedings in order to reveal details of the fraud in support of Applicant's possessory and proprietary claims over the assets stolen by Ablyazov, Khrapunov and their co-conspirators. The Discovery Targets reside or are found in this District, and as such, are proper discovery targets pursuant to 28 U.S.C. § 1782.

55. The Clearing House does not appear to operate in England and will not likely be subject to the jurisdiction of the English Court.

56. Additionally, even though some of the Intermediary Banks do operate business in England, nothing indicates that the Intermediary Banks were knowing participants in the Ablyazov-Khrapunov Money Laundering Scheme or the wider fraud. Instead, it is believed that the fraudsters may have used the Intermediary Banks to receive, transfer and/or conceal the proceeds of the Fraud. Therefore, the Intermediary Banks are also not expected to become parties to the Pending Proceedings or to the Contemplated Civil Proceedings, but hold invaluable information related to the Fraud.

57. The Discovery Targets are not parties to the English Proceedings or the Khrapunov Proceedings and are not expected to become parties to the Contemplated Proceedings. Indeed, absent the instant Application, the evidence would almost certainly remain outside the reach of the English Courts.

58. Further, there is no indication the English Courts would not be receptive to the documentary and testimonial evidence sought through the instant Application. Such evidence

is likely to be admissible in the English Courts, and the Application does not circumvent any proof-gathering restriction under English law.

59. The discovery sought from the Discovery Targets is not intrusive or unduly burdensome. The Applicant seeks documentary evidence concerning payment transactions, which is evidence of the type that the Discovery Targets regularly retrieve and produce as third parties or actual parties in litigation. Furthermore, the Applicant is limiting its requests for CHIPS and intermediary bank payment messages naming or referencing "Panolos", "Ablyazov" and "Khrapunov" to the period beginning with 20 July 2011 (i.e., the date of incorporation of Panolos) to the present and/or to the Discovery Targets' applicable document and/or information retention period.

## CONCLUSION

In light of the foregoing, Applicant respectfully submits that all of the requirements of 28 U.S.C. § 1782 are met:

    a. The Discovery Targets reside and are found in this District;

    b. The Applicant is an "interested person" within the meaning of the statute;

    c. The Applicant seeks to obtain documents and testimony for use in a foreign proceeding; and

    d. The Discovery Targets have relevant and pivotal information concerning Panolos' involvement in the Ablyazov-Khrapunov Money Laundering Scheme that will be of potential significance to the English Proceedings, the Khrapunov Proceedings and the Contemplated Proceedings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Florham Park, New Jersey
       November 16, 2021

                                        /s/ *Jason Kislin*
                                           Jason Kislin